## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

        **v.**

**FREDDELL BRYANT,**

        **Defendant.**

)
)
)
)
)
)
)
)
)

    **Case No. 11-CR-20034**

## OPINION

This case is before the court on Defendant's Consolidated Pretrial Motions. Defendant has filed three motions: 1) Motion to Dismiss Indictment; 2) Motion for *Kastigar* hearing; 3) Motion to Suppress Statements. This court has carefully reviewed the briefs and exhibits submitted. Following this review, Defendant's three motions are DENIED.

## JURISDICTION

The Government has alleged violations of 18 U.S.C. §§ 924(j)(1), 924(c), 1111, and 2. Pursuant to 18 U.S.C. § 3231, the district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States.

## BACKGROUND

On April 4, 2007, in Case No. 07-CR-20043, a federal grand jury returned a four-count indictment against Defendant, alleging (1) conspiracy to distribute cocaine and crack cocaine

from October 2003 through March of 2007; (2) possession of 500 grams or more of cocaine with the intent to distribute it on July 12, 2004; (3) possession of a firearm in furtherance of a drug trafficking crime on October 17, 2003, July 12, 2004, and July 25, 2005; and (4) possession of a firearm by a felon. Based on his prior felony drug convictions and the amount of cocaine involved, Bryant faced a sentence of mandatory life imprisonment on Count 1 of the indictment, plus a consecutive five years on Count 3 of the indictment.

Defendant was arrested and detained. Two days before jury selection was to begin, Defendant signed an agreement with the Government wherein he pled guilty and agreed to cooperate. In his plea agreement, executed on March 24, 2009, and which incorporated the cooperation agreement, he admitted to facts providing culpability for possession of cocaine with intent to distribute and conspiracy to distribute cocaine, covering events occurring between 2003 and 2007. In return, the Government granted him, among other things, use immunity conditioned on his continuing cooperation. The terms of the informal immunity agreement relevant to the cooperation read, in pertinent part:

> 1. The United States agrees that no statement made or information provided pursuant to this agreement may be directly introduced as evidence against your client in any criminal case, including sentencing, excepting (1) a prosecution for making a false statement or perjury, and (2) use as impeachment or rebuttal evidence should he subsequently testify or take a factual position contrary to the information he provides. The United States will be free to make indirect, or derivative, use of his statements. This agreement means only that the fact he made certain incriminating statements pursuant to this agreement may not itself be introduced as evidence against him. The United States will also remain free to discharge its duty to the court by informing the court of any information he provides. The court will be notified that such information was obtained pursuant to this grant of use immunity.

> 2. In return, your client agrees that he will provide <u>complete</u> and <u>truthful</u> information to law enforcement officials regarding his criminal conduct and everything he knows or has reason to believe about the criminal conduct of others. He also agrees to produce any and all documents and physical

evidence of any kind in his possession or under his control that relates to the information he provides.

3. He agrees to provide <u>complete</u> and <u>truthful</u> testimony to any grand jury, trial jury, or judge in any proceeding in which he may be called to testify by the United States.

4. Your client further acknowledges and agrees that he understands that the United States' grant of use immunity herein is conditioned, in part, upon his complete compliance with paragraphs 2 and 3. Should he knowingly make any materially false statement or omission in providing information or testimony under this agreement, the United States will be entitled to use his statements and evidence he provides, directly and indirectly, to institute and support a criminal prosecution for any offense, as well as a prosecution for giving false statements and perjury.

13. Any violation of any part of this agreement by your client will void this agreement in its entirety and will release the United States from any obligation under this agreement.

(#16, Exh. 1) (emphasis in original). As will become clear, the federal agreement critically included, in paragraph 3, a requirement to testify. As part of his cooperation, Defendant provided information and later testimony during the trial of one of his associates, Keric Franklin, for drug trafficking activities, in August 2009.

Separate from and unrelated to the incidents listed in the April 4, 2007 indictment, on March 25, 2007 Danville law enforcement responded to a call and found three deceased individuals: Rodney Pepper, Madisen Leverenz, and Tabreyan McCullough. Subsequent autopsies determined that the cause of death for Pepper was a gunshot wound to the chest and the cause of death for both Leverenz and McCullough were gunshot wounds to the head. Investigators began to suspect Defendant's involvement in this case. On January 14, 2010, Defendant entered into a separate and independent agreement with the Vermilion County State's Attorney, wherein the state offered use immunity in exchange for a taped statement regarding the triple homicide. That agreement read, in pertinent part, as follows:

WHEREAS, Fredell[1] Bryant has agreed to give a complete and truthful taped statement regarding the 2007 Danville triple homicide investigation, and,

WHEREAS, Fredell Bryant acknowledges that this Agreement is not a grant of immunity by the Vermilion County State's Attorney and, in return for the mutual covenants and agreements herein contained, it is further agreed as follows:

1. anything said by Fredell Bryant during the statement cannot and will not be used directly against Fredell Bryant in any criminal prosecution;

2. anything said by Fredell Bryant during the statement cannot and will not be used by a prosecuting authority to bring a criminal prosecution against Fredell Bryant excepting a prosecution for making a false statement or perjury; however, a criminal prosecution may be brought based on independently obtained evidence;

3. anything said by Fredell Bryant during the statement cannot be used by any prosecuting authority in aggravation at a sentencing hearing;

4. this Agreement is conditioned on Fredell Bryant giving a complete and truthful statement regarding his and anyone else's involvement in the triple homicide

5. any violation of any part of this Agreement by Fredell Bryant will void this Agreement in its entirety and will release the Vermilion County State's Attorney's Office from any obligation under this Agreement.

(#16, Exh. 3) Added after paragraph 4, written in handwriting, was the following clause:

"specifically a detailed account of who the shooters were and their roles in the murders." The

handwritten clause was initialed RJB and two additional illegible marks. (RJB are the initials for

Randall J. Brinegar, the Vermilion County State's Attorney, and the Government asserts that the

illegible marks are the signature for Defendant's attorney's associate, Nicole Ciovacco).

Critically, and unlike the federal agreement, the Vermilion County agreement did not include

---

[1] This spelling of Defendant's name is used, *sic erat scriptum*, in the Agreement between Defendant and the Vermilion County State's Attorney. (#16, Exh. 3). Defendant's signature appears to use two Ds, but the handwritten name beneath it, which appears to be in the same hand as the one for the State's Attorney (and who initialed "RJB") uses only one. The heading in this case uses two Ds, but the one for the predecessor case in this court, 07-CR-20043, indicates "Freddell Bryant, *also known as* Fredell Bryant".

any clause requiring the signatory to provide testimony before any grand jury, trial jury, or judge. Furthermore, the United States was not a party to, did not review, and was not aware of the specifics of the state agreement at the time it was executed.

With the two cooperation agreements signed, on January 14, 2010 and February 24, 2010 Defendant gave recorded statements to state law enforcement implicating himself and others in the triple homicide. On January 14, 2010, Bryant told officers that the triple homicide occurred because "some drugs and money came up missing." He indicated that following a disagreement over several kilograms of cocaine, he, McCullough, and two other individuals went to Leverenz's apartment to search for the drugs. According to the facts presented by the Government, Defendant then stated that he shot Pepper, Leverenz, and McCullough.

On February 24, 2010, law enforcement interviewed Defendant a second time to allow him to correct some information that they believed was erroneous or not credible. The Government indicated that at this interview, Defendant said that after he and the other two individuals arrived at the apartment, Pepper had tried to flee, and Defendant followed Pepper and shot him. When Defendant returned, he found that Leverenz and McCullough had been shot. Defendant identified the two other individuals from a photo lineup.

On April 29, 2010, Defendant was sentenced in this court. Nominally, Defendant qualified for a sentence of mandatory life in prison. During the hearing, the Government noted that Defendant had provided substantial assistance and recommended a 384-month sentence, consisting of 27 years on Counts 1 and 2, to be served concurrently, and five years on Count 3, served consecutively. (Transcript of Sentencing Hearing on April 29, 2010, 12:17-18; 13:19-24, hereinafter Trans.). Furthermore, in the sentencing hearing, the following exchange occurred, regarding the Government's intention of the scope of cooperation:

> THE COURT:  Is this a case where there is any possibility of a Rule 35?
> GOVERNMENT:  Your Honor, I, I guess that's always a possibility, but it's --
> THE COURT:  Or this has all been considered?
> GOVERNMENT:  It's not been anticipated. That's right, Your Honor.

(Trans. 11:2-8). Based on the cooperation, including his testimony, and the Government's § 3553(e) motion, this court sentenced Defendant to 300 months, comprised of 240 months on the drug charges and 60 months on the § 924(c) charge.

In March 2011, the Vermillion County State's Attorney sought to have Defendant testify before a state grand jury regarding the facts in the triple murder case. Defendant declined to cooperate, expressing that it was his understanding that his cooperation was concluded, and invoked his Fifth Amendment right against self-incrimination. The state authorities then requested that the U.S. Attorney's Office consider reopening its investigation. The Government asseverates that this was the first time that it learned that the Vermilion County State's Attorney's cooperation agreement did not require Defendant testify in state proceedings.

In April 2011, Defendant was brought to testify in front of the federal grand jury, allegedly pursuant to the terms of his cooperation agreement with the Government. Defendant again refused to testify. The Government then notified Defendant that he had until May 3, 2011 to change his mind and cooperate or consider that he was in breach of the agreement. On May 4, 2011, having not received any further cooperation from Defendant, the Government wrote Defendant a letter indicating that it now was treating him as having willfully violated his cooperation agreement by refusing to provide complete and truthful testimony before the grand jury. That letter also indicated that the Government treated that violation as having voided the cooperation agreement and thereby releasing the Government from any obligation under the agreement. Last, the Government asserted that it would be entitled to use Defendant's recorded statements to support a criminal prosecution against him.

On July 13, 2011, the grand jury for the Central District of Illinois returned an indictment against Defendant for three counts of murder by use of a firearm during a federal felony in this case. On September 14, 2012, Defendant's counsel filed the present consolidated pre-trial motions.

## ANALYSIS

This case poses an unusual set of facts. Normally, breaches of informal immunity agreements occur during the pendency of the proceedings giving rise to the agreement.[2] A defendant agrees to provide evidence against his associates, necessarily implicating himself in those unlawful acts, in exchange for a recommendation of a lighter sentence and immunity from having those statements used against him. But then the accused is reminded of the consequences of cooperating too freely with the government, and refuses to testify or "forgets" on the stand what he told prosecutors. The Government is then fairly allowed to treat the agreement as void and not only decline to recommend a lesser sentence, but also to use those statements against him.

In this case, however, the question is over the scope of that immunity agreement. In early 2009, when faced with federal drug trafficking charges, Defendant agreed to cooperate. Several months later, he did cooperate when federal prosecutors tried his associate for drug trafficking, by testifying against him at a bench trial. But then law enforcement started to suspect that Defendant had been separately involved in a grisly triple homicide that had occurred years earlier. Three years into the investigation, state prosecutors entered into an informal immunity

---

[2] These agreements are more properly called "promises not to prosecute" since they are contractual in nature and are not true immunity. However, for the sake of following the terms used by the parties, this opinion shall refer to them as "informal immunity agreements".

agreement with Defendant, perhaps eager to bring the matter to a close. With both state and federal immunity agreements established, Defendant admitted during interviews in January and February 2010 that he had been involved in the homicide and provided recorded statements implicating himself and his associates.

Following this cooperation, federal prosecutors, satisfied with his aid, recommended a lowered sentence during his own drug trafficking charges, in accordance with his federal agreement. On April 30, 2010, this court subsequently sentenced Defendant to substantially fewer years than the life imprisonment that his criminal record would have otherwise demanded. That matter therefore appeared to be concluded.

However, in March 2011, state prosecutors requested that Defendant testify against his two associates before the state grand jury. He refused, citing to his immunity agreement with the state. Imagine their surprise when they reviewed the immunity agreement and discovered that it did not specifically require that he testify. With no way to force his hand, it appears that the state prosecutors turned to the federal prosecutors and requested that they leverage their more comprehensive agreement against the defendant and compel him to testify in front of the grand jury. Again, the defendant refused, asserting that his duties pursuant to the federal cooperation agreement had terminated. In response, federal prosecutors now argue that because he violated the terms of his cooperation agreement, the Government was released from all its obligations. As a result, they have filed the present case. Not only do they seek to prosecute him for the murders, but they also seek to use his own admissions of culpability, recorded during the January and February 2010 interviews with state authorities, against him.

Thus, the critical issue posed by this case is thus: How far does a cooperation agreement extend in jurisdiction, subject-matter, and time? If the Government may not use a defendant's

statements against him *ad perpetuum*, is the defendant similarly required to cooperate until his end of days? And is the defendant required to testify about any criminal acts that he knows about, or is there some implicit limitation on the material?

**Motion to Dismiss Indictment and Motion to Suppress Statements**

The Fifth Amendment creates a right against self-incrimination. U.S. Const. amend. V; *Malloy v. Hogan*, 378 U.S. 1 (1964) (incorporating the right to the states through the Fourteenth Amendment). However, because the federal statute codifying that right provides a witness protection from prosecution that is coextensive with the scope of the privilege against self-incrimination, *United States v. Eliason*, 3 F.3d 1149, 1152 (7th Cir. 1993), the government has an option to exchange the stated privilege for an immunity to prosecutorial use of any compelled inculpatory testimony. *United States v. Balsys*, 524 U.S. 666, 682 (1998).

The constitutional right, however, is not self-executing. *Minnesota v. Murphy*, 465 U.S. 420, 436 (1984). Instead, 18 U.S.C. § 6002 requires that the witness must invoke the privilege by refusing to testify in a proceeding on the basis of his privilege against self-incrimination and the judge orders the witness testify on the condition that no information compelled under the order may be used against him in a criminal case. The witness may forfeit the right by neglecting to invoke it. *United States v. Murphy*, 768 F.2d 1518, 1532 (7th Cir. 1985).

In the interest of expediency, informal grants of immunity may be offered by the prosecution. These are voluntary arrangements in which a witness agrees to testify on terms satisfactory to the parties. *Murphy*, 768 F.2d at 1532. "When a defendant enters an informal immunity agreement with the government rather than asserting his Fifth Amendment privilege against being compelled to incriminate himself, the scope of informal immunity is governed by

the terms of the immunity agreement." *United States v. McFarlane*, 309 F.3d 510, 514 (8th Cir. 2002) (editing marks omitted). Informal immunity agreements between the Government and a defendant are therefore analogous to and similarly governed by principles of contract interpretation. *Id.*; *see also United States v. Brown*, 979 F.2d 1380, 1381 (9th Cir. 1992). Thus, promises not to prosecute are categorically different from constitutional or statutory grants of immunity, as there has been no compulsion.

The first issue is whether requirements to provide information in a cooperation agreement may be enforced across jurisdictions and across different allegations of unlawful behavior. As one commentator noted, "Immunity creates special difficulties when a person's suspected behavior may constitute crimes subject to prosecution by different prosecutors." 1 McCormick on Evidence § 142 (6th ed.). It is not contested that "the constitutional privilege against self-incrimination protects a state witness against incrimination under federal as well as state law and a federal witness against incrimination under state as well as federal law. *United States v. Balsys*, 524 U.S. 666, 680 (1998). Additionally, a state witness may not be compelled to give testimony that may be incriminating under federal law unless the compelled testimony and its fruits cannot be used in any manner by federal officials in connection with a criminal prosecution against him. *United States v. Cozzi*, 613 F.3d 725, 731 (7th Cir. 2010) *cert. denied,* 131 S. Ct. 1472 (2011), *citing Murphy v. Waterfront Comm'n of New York Harbor*, 378 U.S. 52, 58 (1964) *abrogated on unrelated grounds by United States v. Balsys*, 524 U.S. 666 (1998). However, promises not to prosecute are not subject to the same restrictions as the constitutional right against self-incrimination. This is because there is no government compulsion to disclose; instead, when a defendant voluntarily reveals information in exchange for use immunity and only one government is a party to an agreement, the other cannot be necessarily bound. *United States v.*

*Eliason*, 3 F.3d 1149, 1153-54 (7th Cir. 1993). This outcome is logical because "if state agreements that immunize criminal defendants from state charges could bind federal prosecutors, state prosecutors would be able to usurp federal prosecutorial discretion." *United States v. Roberson*, 872 F.2d 597, 611 (5th Cir. 1989). An agreement between a defendant and state prosecutors cannot bind federal authorities unless there was an agency relationship, and neither party has presented any evidence that any such relationship exists. *U.S. v. Long*, 511 F.2d 878, 880 (7th Cir. 1975). Nor did Defendant enter into an agreement with both state and federal authorities in which the federal government was barred from using the statements given to state prosecutors. *Eliason*, 3 F.3d at 1153.

*U.S. v. Barone* demonstrates the counterpoint. There, a defendant executed a cooperation agreement with federal prosecutors in which they promised to "bring no additional charges against the defendant for criminal conduct related to activity which he has disclosed during proffer sessions with federal agents prior to the entry of his guilty pleas." *United States v. Barone*, 781 F. Supp. 1072, 1074 (E.D. Pa. 1991). When the federal prosecutors instead apparently passed on information to state prosecutors, and the state resurrected its own investigation, the district court enjoined the federal prosecution. It opined that "[s]ince the Government cannot be permitted to accomplish indirectly what it is bound not to do directly, taking action likely to cause the State of New Jersey to bring charges against Mr. Barone the federal government would be barred from bringing, is a violation of the plea agreement." *Id.* at 1078. The terms of the agreement in *Barone*, which provided the equivalent of transactional immunity, were much broader than the ones here, which provide only use, and not even derivative use, immunity. The agreement here only provided that the Government "agrees that no statement made or information provided pursuant to this agreement may be directly introduced

as evidence against your client in any criminal case, including sentencing… [and] will be free to make indirect, or derivative, use of his statements." *Barone* is thus distinguishable.

Second, this discussion proceeds to the scope of the subject-matter of the voluntary testimony. Defendant negotiated his cooperation agreement during the pendency of his drug trafficking charges in reliance on the Government's promise not to prosecute. Later, he gave information about his participation in the 2007 homicide. The Government sought to enforce his promise to cooperate by compelling him to testify about the 2007 homicide. As the homicides were not attributed to Defendant at the time of the federal agreement, much less part of the prosecution, can the agreement be prospectively binding on heretofore-unknown crimes? What about for crimes that had not yet been committed, but about which the defendant might learn while incarcerated? The agreement required that he "provide complete and truthful information to law enforcement officials regarding his criminal conduct and everything he knows or has reason to believe about the criminal conduct of others," as well as "provide complete and truthful testimony to any grand jury, trial jury, or judge in any proceeding in which he may be called to testify by the United States." This agreement, while extraordinarily broad, must control. An interpretation that the agreement requires information about other crimes is not only not unlawful, but has not been contested by Defendant as contrary to his intent at the time of execution. *See* Restatement (Second) of Contracts §§ 201, 203.

Last, Defendant argues that it was his intent and belief that the scope of the cooperation agreement terminated at the time of sentencing. As a general proposition, both the waiver of the right against self-incrimination as well as the act of entering into a contractual obligation requires that the act to be knowing and voluntary. *Brady v. United States*, 397 U.S. 742, 748 (1970) ("Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent

acts done with sufficient awareness of the relevant circumstances and likely consequences.");
Restatement (Second) of Contracts § 164(1) ("If a party's manifestation of assent is induced by
either a fraudulent or a material misrepresentation by the other party upon which the recipient is
justified in relying, the contract is voidable by the recipient."). Although Defendant does not take
the position that he did not enter into the arrangement "knowingly", *per se*, he impliedly argues
that it was his understanding that because he thought that his duty to cooperate terminated at
sentencing, he was unaware of the relevant circumstances and likely consequences.

The Government responds that it cannot be true that the agreement was terminated
because if so, both sides would be released from further obligations and it would be free to use
Defendant's statements against him. The Government reads too closely into Defendant's words.
Clearly, Defendant's intent is to argue that, by providing information and testifying at his
associate's trial, up through the sentencing hearing, he has fully performed his contractual
obligations and has thereby discharged his duty, whereas the Government's duty of refraining
from using his statements against him in any criminal case is not discharged until his Defendant
can no longer be prosecuted for those activities, whether due to legal or practicable reasons. This
situation is no different than if Defendant offered to build a fence in exchange for the
Government refraining from walking on Defendant's property. Once the fence is built,
Defendant's duties are discharged; the Government's ongoing duties are not discharged simply
because the fence is built.

Defendant therefore argues that the cooperation agreement is vague and ambiguous,
requiring this court to refer to extrinsic evidence to fully interpret. This court disagrees. A
contract is unambiguous if it is susceptible to only one reasonable interpretation. *Indep. Const.
Equip. Builders Union (ICEBU) v. Hyster-Yale Materials Handling, Inc.*, 83 F.3d 930, 933 (7th

Cir. 1996). Where a contract is unambiguous, a court must determine its meaning as a matter of law. *Id*. "Subjective evidence of ambiguity, which is the testimony of the parties themselves as to what they believe the contract means, is… inadmissible to establish that a contract is extrinsically ambiguous." *CSX Transp., Inc. v. Chicago & N. W. Transp. Co., Inc.*, 62 F.3d 185, 189 (7th Cir. 1995). Here, the text of the contract does not indicate that Defendant's obligation to cooperate or testify ceased after the sentencing hearing. There is no explicit terminus, and thus, there is no reasonable reading to suggest that there was some end to Defendant's duties. Further, this reading is supported by the fact that Defendant would also expect that the Government's duty to refrain from using his statements against him does not terminate. Referring back to the analogy above, the duty of continuing cooperation would be similar to a duty to not tear down the fence after Defendant had built it.

The result is unchanged even if the contract is construed as ambiguous. The cooperation agreement contains an integration clause, requiring that "This letter embodies the entirety of the United States' use immunity agreement with your client. No other promise or agreement exists between your client and the United States regarding immunity." (#16, Exh. 1). An integration clause is a clear indication that the parties desire the contract be interpreted solely according to the language used in the final agreement. *Much v. Pacific Mut. Life Ins. Co.*, 266 F.3d 637, 644 (7th Cir. 2001); *see also Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 608 (7th Cir. 1993) ("Although the parol evidence rule, which enforces integration clauses by barring evidence of side agreements, does not bar the use of extrinsic evidence to clarify the meaning of an ambiguous text, the presence of such a clause is some indication of the parties' desire to limit a free-ranging judicial discretion to interpolate terms.") (internal citation omitted). However, it cannot be the only source of interpretation. The Government takes the position that the presence

of an integration clause mandates that unilateral oral comments *shall not* amend the terms of a written contract, but that cannot be the case. If a term is ambiguous and an integration clause denies absolutely the court's power to resort to extrinsic evidence or, worse, reformation, the only fallback is to treat the promise as unenforceable. *Tranzact Technologies, Ltd. v. Evergreen Partners, Ltd.*, 366 F.3d 542, 547 (7th Cir. 2004); *Sphere Drake Ins. Ltd. v. All Am. Ins. Co.*, 256 F.3d 587, 592 (7th Cir. 2001). It is more preferable to rely on extrinsic evidence than to void the agreement.

"If the contract is ambiguous, the proper construction of the contract's terms—that which accords with the intent of the parties—is a question of fact, and the court may turn to extrinsic evidence to determine the intent of the parties." *Houben v. Telular Corp.*, 231 F.3d 1066, 1072 (7th Cir. 2000). Defendant argues that the Government avoids framing the issue as contract negotiation because "[f]actual issues such as consideration received, substantial performance, discharge of duties and the like all gravitate against the government". This court agrees that in the alternative, if the contract is ambiguous, factual issues are at stake. However, the factual issues are not only not substantially in dispute, but favor the government.

Extrinsic evidence may consist of usages of trade, course of dealing, or exchanges between the contracting parties. *Ne. Communications of Wisconsin, Inc. v. CenturyTel, Inc.*, 516 F.3d 608, 611 (7th Cir. 2008). Regarding exchanges between the parties, Defendant asserts that, when questioned whether the state case might be the subject of a subsequent Rule 35 proceeding, the Government stated that it was "not anticipated." Federal Rule of Criminal Procedure 35 affords the Government the right to request the court "reduce a sentence if the defendant, after sentencing, provided substantial assistance in investigating or prosecuting another person." Defendant suggests that because the Government did not anticipate needing to move for a Rule

35 reduction, that the Government intended that Defendant's further cooperation would be only with state authorities and not subject to the ongoing federal proceedings. This court disagrees. The exchange in question occurred as follows:

> THE COURT:  Is this a case where there is any possibility of a Rule 35?
> GOVERNMENT:  Your Honor, I, I guess that's always a possibility, but it's --
> THE COURT:  Or this has all been considered?
> GOVERNMENT:  It's not been anticipated. That's right, Your Honor.

(Trans. 11:2-8). Although no cooperation was anticipated, suggesting the Government had no further plans at the sentencing hearing, it also did not clearly preclude itself from considering future cooperation.

Defendant also suggests that a prior course of dealing provides extrinsic evidence that the cooperation was terminated at sentencing. A course of dealing is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct. Restatement (Second) of Contracts § 223(1). Defendant has not suggested any prior conduct between himself and the Government showing a reasonable assumption existed on both sides that his cooperation duties would terminate at sentencing. In fact, the availability of a Rule 35 motion by the Government up to one year after sentencing, and more than one year in limited circumstances, strongly favors an interpretation that the parties should have expected that continued cooperation could still occur.

*Ricketts v. Adamson*, 483 U.S. 1 (1987), is analogous, although it did not address the present issue on all fours. In *Ricketts*, a defendant was arrested and charged with first-degree murder in state court. While jury selection was underway, he pled guilty to a lesser charge and agreed to testify against his two associates in the murder. His agreement provided that the "entire agreement is null and void and the original charge will be automatically reinstated" if he should

"refuse to testify or should he at any time testify untruthfully". The defendant there testified as obligated and his two associates were convicted. The defendant was then sentenced. Several years later, following appeal, the convictions of the two associates were reversed and remanded for retrial. The government sought to compel the defendant to testify again, but he refused, indicating that he believed that his obligation had terminated when he was sentenced. The government deemed him to be in breach of the agreement and indicted him, charging him with first-degree murder. *Id*. at 3-7. The defendant argued that the Double Jeopardy clause prevented the government from re-prosecuting him. The *Ricketts* court disagreed, holding that the defendant's "breach of the plea arrangement to which the parties had agreed removed the double jeopardy bar to prosecution of respondent on the first-degree murder charge". *Id*. at 8. The Court continued: "The terms of the agreement could not be clearer: in the event of respondent's breach occasioned by a refusal to testify, the parties would be returned to the *status quo ante." Id.* at 10.

Similarly, in the present case, Defendant refused to testify before the federal grand jury according to the broad terms of his federal plea agreement. Not only does *Ricketts* hold that the Double Jeopardy Clause does not bar re-prosecution, the Court also did not seem concerned that the second prosecution occurred years after the first one. While the present agreement does not "automatically reinstate" the charge, it does specifically entitle the Government to "use his statements and evidence he provides, directly and indirectly, to institute and support a criminal prosecution for any offense."[3]

---

[3] Despite all the references to the agreement being "void", it is clear that the Government does not intend that the agreement is void *ab initio* in the sense of never having existed, *Laborers' Pension Fund v. A & C Envtl., Inc.*, 301 F.3d 768, 779 (7th Cir. 2002), or avoidable in the sense that it may avoid its obligations or validate it at its option, *Griffin v. Smith*, 101 F.2d 348, 350 (7th Cir. 1938), or to allow the withdrawal of the plea, *United States v. Williams*, 198 F.3d 988, 993 (7th Cir. 1999). Since the Government seeks to avoid its obligations, but use Defendant's statements against him, which it would not have gained but for its original offer that it now withdraws due to Defendant's breach, a closer analogy is that the forfeiture of the grant of use immunity is a form of liquidated damages or penalty.

Having concluded on the facts presented by this case that the cooperation agreement is binding both across subject-matter and time, and not binding across jurisdiction, we are compelled to express some concern about cooperation agreements that have no explicit limitations. Defendant raises this concern, suggesting in his Reply that it should be absurd that because he "merely executed a cooperation agreement with federal authorities, anything he says thereafter to anybody, anytime, anywhere, and under any circumstances becomes the sole province of the federal government." If such an agreement truly has no restriction on both subject-matter and time, the Government would need only secure a single cooperation agreement from any defendant provided that any subsequent alleged unlawful acts carried a lesser sentence than the first. Rather than offering to promise not to prosecute for each separate and independent unlawful act during the defendant's subsequent indictments, the Government would be permitted merely to require the defendant provide information regarding the subsequent crime, or face the consequences of being in breach of contract for prior crimes. Such an interpretation would fail to meet the demands of due process and fundamental fairness. But those facts are not presented in this case.

The Government does attempt to prospectively address this concern. It argues that this "is not a case where the defendant was called to testify before a federal grand jury years after his sentencing regarding a matter previously unknown to the parties." However, it does not cite to any rule that would place boundaries on this type of act. Instead, it argues first that "[a]s a practical matter, in many cooperation cases, there are not additional charges that could be brought against the defendant for violating the cooperation agreement." This is hardly an unequivocal bar against doing so. Second, it argues that "a defendant's criminal exposure for violating a cooperation agreement typically would not go on *ad infinitum* since any charges must

be filed within the applicable statute of limitations. *See, e.g.*, 18 U.S.C. § 3282 (setting forth general five-year statue of limitations for most federal offenses)." Neither addresses the issue of subsequent unrelated and independent crimes. One potential reason why the government would continue to offer cooperation agreements and use immunity in subsequent cases would be that failing to do so would defeat the traditional incentives of cooperation for that case, and would therefore be self-detrimental. During his sentencing hearing, this court already significantly credited his cooperation regarding his drug trafficking activities.

This court holds, based on the facts in this case, including, but not limited to, the short duration between the two interviews and that Defendant was involved in drug trafficking at the time that he committed the homicide (and admitted as much in his statement to state prosecutors), thereby creating a factual nexus between the two indictments, that the federal authorities were permitted to leverage his earlier use immunity agreement to compel him to testify regarding the homicides. Because the federal cooperation agreement was still binding on Defendant, the Government requested Defendant testify before the grand jury, and Defendant refused to do so, Defendant must be found in breach of his cooperation agreement. Therefore, the Government is not bound by its previous promise not to use his statements against him.[4] Accordingly, Defendant's Motion to Dismiss Indictment and Motion to Suppress Statements are denied.

**Motion for *Kastigar* hearing**

---

[4] Defendant has not asserted that further cooperation would place his life in danger, so the dicta in *United States v. Hartmann* does not apply. 958 F.2d 774, 791 (7th Cir. 1992). Even if it does, because the *Hartmann* court neither required an evidentiary procedure in such a circumstance, nor did it rule that an exception would be necessary, we hold, as that Court did, that a defendant must "honor the cooperation agreement in order to enjoy the benefits that the government has promised." *Id*. at 792.

A defendant "raising a claim under [18 U.S.C. § 6002] need only show that he testified under a grant of immunity in order to shift to the government the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." *Kastigar v. United States*, 406 U.S. 441, 461-62 (1972). The government must sustain that burden of proof at a *Kastigar* hearing. A defendant is entitled to such a hearing if he can establish that he gave compelled testimony in a court proceeding 1) based upon a promise of immunity; or 2) under a threat of contempt after invoking the privilege against self-incrimination. *United States v. Eliason*, 3 F.3d 1149, 1152 (7th Cir. 1993). The present case proceeds on the first type. "Informal grants of use and derivative use immunity are fully enforceable and implicate the provisions of *Kastigar*." *United States v. Quintanilla*, 2 F.3d 1469, 1483 (7th Cir. 1993). "Agreements of this nature are enforced not because of the self-incrimination clause but because the due process clause requires prosecutors to scrupulously adhere to commitments made to suspects in which they induce the suspects to surrender their constitutional rights in exchange for the suspects giving evidence that the government needs against others which simultaneously implicates themselves." *Id*. at 1153.

Here, as discussed above, Defendant has preemptively violated the terms of his plea and immunity agreements by refusing to testify before the grand jury. Therefore, even though the Government readily acknowledges that it used Defendant's statements in order to obtain the July 2011 indictments, it also argues that it was not bound by the grant of conditional use immunity at the time they were presented to the grand jury. Since Defendant forfeited his use immunity, the Government is not compelled to demonstrate that its evidence it used to secure the indictment was derived from a legitimate independent source.

In his Reply, Defendant seizes on the following language: "We hold the constitutional

rule to be that a state witness may not be compelled to give testimony which may be incriminating under federal law unless the compelled testimony and its fruits cannot be used in any manner by federal officials in connection with a criminal prosecution against him." *Murphy v. Waterfront Comm'n of New York Harbor*, 378 U.S. 52, 79 (1964).

Defendant notes that there is nothing in the record to suggest that either federal investigators or prosecutors had any reason to suspect him of the homicides. Defendant further suggests that when state prosecutors realized that their immunity agreement was lacking in scope, they requested that the federal prosecutors consider opening an investigation and interview. Therefore, Defendant then appears to argue, based on the "fruits" language and "derivative basis" language, that because the state proceedings were distinct and independent from the federal proceedings, and because his statements to state authorities were immunized and shielded, that federal authorities should not have been able to use their knowledge gained from the state prosecutors. As Defendant frames the issue: Whether statements given to state authorities in exchange for a state use immunity agreement may be used against Defendant in a federal prosecution?

The answer is yes. As there is no mention in the record of any agreement between the state and Defendant binding the federal government from using the information Defendant provided to state authorities, the state is without authority to bind the federal government in such a contract. *See United States v. Eliason*, 3 F.3d 1149, 1154 (7th Cir. 1993). As in *Eliason*, if Defendant wanted to limit the use the federal government could make of the information he provided to Illinois prosecutors, he and his counsel were obliged to follow the accepted procedures and obtain such an agreement or promise from the federal government. *Id*. at 1153. Therefore, under the facts of the current case, the federal government is not bound by the use

immunity negotiated with the state prosecutors and thus is permitted to use statements given to state prosecutors against Defendant. Furthermore, because Defendant breached his federal agreement, federal prosecutors are also not bound by the terms of that agreement. Accordingly, Defendant is not entitled to a *Kastigar* hearing.

IT IS THEREFORE ORDERED THAT:

(1) Defendant's Motions to Dismiss Indictment, for a *Kastigar* Hearing, and to Suppress Statements (#16) are DENIED.

(2) The Final Pretrial Conference remains set for November 16, 2012 at 11:00am.

Entered this 15th day of November, 2012

s/MICHAEL P. McCUSKEY

U.S. DISTRICT JUDGE